Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
04/14/2020 09:07 AM CDT

Joel Guthard, appellee, v.
Jennifer Guthard, appellant.
___ N.W.2d ___

Filed April 14, 2020.    No. A-18-498.

1. **Modification of Decree: Child Support: Appeal and Error.**
   Modification of child support is entrusted to the discretion of the trial
   court. An appellate court reviews proceedings for modification of child
   support de novo on the record and will affirm the judgment of the trial
   court absent an abuse of discretion.
2. **Evidence: Appeal and Error.** In a review de novo on the record, an
   appellate court reappraises the evidence as presented by the record and
   reaches its own independent conclusions with respect to the matters
   at issue.
3. **Judgments: Words and Phrases.** A judicial abuse of discretion
   requires that the reasons or rulings of the trial court be clearly unten-
   able insofar as they unfairly deprive a litigant of a substantial right and
   a just result.
4. **Child Support: Rules of the Supreme Court.** Interpretation of the
   Nebraska Child Support Guidelines presents a question of law.
5. **Judgments: Appeal and Error.** When reviewing questions of law,
   an appellate court resolves the questions independently of the lower
   court's conclusions.
6. **Modification of Decree: Child Support: Proof.** A party seeking to
   modify a child support order must show a material change in circum-
   stances which (1) occurred subsequent to the entry of the original decree
   or previous modification and (2) was not contemplated when the decree
   was entered.
7. **Child Support: Rules of the Supreme Court: Words and Phrases.**
   The Nebraska Child Support Guidelines provide that in calculating
   the amount of child support to be paid, a court must consider the total
   monthly income, which is defined as income of both parties derived
   from all sources, except all means-tested public assistance benefits

which includes any earned income tax credit and payments received for children of prior marriages and includes income that could be acquired by the parties through reasonable efforts.

8. **Child Support: Rules of the Supreme Court.** The Nebraska Supreme Court has not set forth a rigid definition of what constitutes income, but instead has relied upon a flexible, fact-specific inquiry that recognizes the wide variety of circumstances that may be present in child support cases.

9. **Child Support: Taxation: Equity: Rules of the Supreme Court.** Income for the purposes of calculating child support is not necessarily synonymous with taxable income. A flexible approach is taken in determining a person's income for purposes of child support, because child support proceedings are, despite the child support guidelines, equitable in nature.

10. **Child Support: Employer and Employee.** Income for the purposes of calculating child support should not be based on income that is speculative in nature and over which the employee has little or no control.

11. **Taxation: Corporations: Words and Phrases.** Subchapter S is a tax status designed to tax corporate income on a pass-through basis to shareholders of a small business corporation.

12. **Taxation: Corporations.** Since a subchapter S corporation is not taxed on its earnings, the various income, expense, loss, credit, and other tax items pass through and are taxable to or deductible by shareholders in a manner analogous to that which is applicable to partners.

13. **Child Support: Corporations.** Any determination whether and to what extent the undistributed earnings of an S corporation should be deemed available income to a parent-shareholder for child support purposes must be based on the particular circumstances presented in each case.

14. **____: ____.** A fact-specific inquiry is necessary to balance considerations that a well-managed corporation may be required to retain a portion of its earnings to maintain corporate operations and survive fluctuations in income, but corporate structures should not be used to shield available income that could and should serve as available sources of child support funds.

15. **____: ____.** Relevant factors to weigh in determining what portion of undistributed corporate earnings may be available to a shareholder for child support purposes should include the following considerations: (1) the shareholder's level of control over the corporation's distributions— as measured by the shareholder's ownership interest, (2) the legitimate business interests justifying the retained corporate earnings, and (3) the corporation's history of retained earnings and distributions to determine

whether there is any affirmative evidence of an attempt to shield income by means of retained earnings.

16. **Child Support: Rules of the Supreme Court: Presumptions: Proof.** If the moving party shows that the nonmoving party earns or can reasonably expect to earn a certain amount of income on a regular basis, a rebuttable presumption of including such income arises under the Nebraska Child Support Guidelines. After the moving party has met its burden of proof, the nonmoving party must produce sufficient evidence to rebut the presumption that the application of the guidelines will result in a fair and equitable child support order before deviation from the guidelines is appropriate. If the nonmoving party can show that the included income is speculative in nature and over which the person has little or no control, the presumption of including the income is rebutted and it shall be excluded from the calculation.

17. **Child Support: Corporations: Taxes: Evidence: Proof.** Distributions made to a shareholder of a subchapter S corporation, as reported on a schedule K-1, should not be included as income for purposes of calculating child support for those portions of the distribution intended to offset the shareholder's personal tax liability on his or her proportionate share of the S corporation's pass-through earnings. However, if the evidence establishes that the total distribution exceeds the shareholder's tax liability on his or her proportionate share of the S corporation's pass-through earnings, such excess portions of the distribution may be included as income for child support purposes unless the evidence demonstrates that such excess amounts are reasonably expected to be applied to future tax liabilities.

Appeal from the District Court for Buffalo County: William T. Wright, Judge. Affirmed.

Nathan P. Husak and Loralea L. Frank, of Bruner Frank, L.L.C., for appellant.

Elizabeth J. Klingelhoefer, of Jacobsen, Orr, Lindstrom & Holbrook, P.C., L.L.O., for appellee.

Moore, Chief Judge, and Pirtle and Bishop, Judges.

Bishop, Judge.
Jennifer Guthard appeals from the decision of the Buffalo County District Court denying her request for an upward modification of Joel Guthard's child support obligation. To

determine Joel's income for child support purposes, Jennifer sought inclusion of his salary; nonpassive income, distributions, and "in-kind" benefits from Joel's 50-percent ownership in an S corporation; and rental income from another business. Limited by the evidence presented to it, the district court declined to include income beyond Joel's salary for child support purposes. Finding no abuse of discretion, we affirm.

## BACKGROUND

Jennifer and Joel were divorced in December 2004. Pursuant to the decree, Jennifer was awarded custody of the parties' two children, born in 2002 and 2004, subject to Joel's specified parenting time. Joel was ordered to pay child support in the amount of $1,137 per month; this was based on his earning capacity of $69,000 per year and Jennifer's earning capacity of $19,968 per year.

Joel filed a complaint to modify in March 2016 and, subsequently, an amended complaint in May, seeking to modify his parenting time schedule and establish a procedure for reimbursement of noncovered medical expenses. Jennifer filed a "counter complaint" alleging that Joel's income had increased, thus warranting an upward modification of his child support obligation.

At the modification trial in March 2018, the district court was informed that the parties had, for the most part, agreed on a modification of the parenting plan. The only issue addressed at trial which is relevant to this appeal is the modification of child support. Jennifer asked the court to include Joel's 2016 schedule K-1 (K-1) of "approximately $300,000" from his 50-percent ownership in a corporation when determining his income for purposes of child support. Joel and the accountant who prepared his personal tax returns testified, and numerous exhibits, including Joel's tax returns and K-1's, were also received into evidence.

Joel testified that he and Brad Snyder are each 50-percent owners of GAS Electrical Services, Inc. (GAS Electrical),

which is a subchapter S corporation. The corporation was originally started by Snyder in 2005. GAS Electrical is an industrial electrical contractor that works on ethanol plants; the corporation is based out of Iowa and "would be an Iowa corporation with a Nebraska corporation, along with being licensed in South Dakota, Kansas, Missouri, [and] Colorado." Joel said that Snyder is "the paperwork guy" for the corporation and that Joel is "the work guy." Joel said that he is "more a field guy going from job site to job site" and that he is "on the road more often than not" because "everything is on the road." Joel does "all the electrical aspects in the field" and supervises employees. At the time of trial, the corporation had 9 to 12 employees, but has had up to 32 employees.

Joel denied that he kept track of the business and its finances. When asked if he reviewed business expenses and financial statements, Joel responded, "We go through [sic] maybe once every year." When asked if he had any control in deciding when assets are bought or sold by GAS Electrical, Joel said "my co-partner buys his parts, I buy my parts and things on that order"; he agreed he had a 50-percent say in the assets of the company. Joel also agreed that he and Snyder decide together how income is going to be distributed and how much money is going to be retained in the business. They also determine the compensation of all employees of GAS Electrical, including their own; Joel and Snyder get the same salary. Joel's salary was $50,000 in 2015 and was $65,000 in 2016 and 2017 (he did not give himself a raise in 2017 despite stating that 2016 was an "exceptional year" for the business). Joel said that the business pays a percentage of insurance premiums, he drives a company-owned vehicle (the company pays for the fuel, tires, and all vehicle expenses), he has a company credit card ("[f]or road expenses on fuel only and whatever material [he] might have to do"), and the company pays for his cell phone. And as will be explained below, Joel also receives distributions from GAS Electrical to pay his personal income taxes.

Joel testified that he and Snyder also formed SnyGut LLC in 2016 or 2017; they are each 50-percent owners. SnyGut owns a bar, which the company leases out to another individual for $1,200 per month. Joel acknowledged that his annual percentage of the rental income is $7,200, "[m]inus whatever maintenance and all that [sic] other fees would be." However, on cross-examination, he said that the rent is paid to SnyGut and that the $7,200 was not paid to him.

Errol Coslor, a certified public accountant, testified that he has prepared individual tax returns for Joel since 2005; Coslor is not the accountant for GAS Electrical. Coslor explained that the election to be taxed as an S corporation is basically an election to have the shareholders pay the income tax, rather than having the corporation pay the income tax. He also explained that a K-1 is issued by an S corporation showing income items and deductions that are to be included on the individual shareholder's tax return. Joel agreed that the business income reported on his K-1 represents half of the business income for that year; he also believed that amount was after his salary and taxes were paid. Further, Coslor indicated that the K-1 does not need to be attached to the tax return, but, rather, the income just needs to be reported. When asked if there was a common practice year after year to estimate how much K-1 income there would be from the corporation, followed by a real distribution of funds to make the estimated tax payments, Coslor responded, "I believe so, yes." Joel testified that in 2017, he prepaid $108,000 for taxes to the federal government and $12,000 for taxes to Nebraska; when asked how he could make those payments when he takes a $65,000 salary, Joel responded that the money for the tax payments comes from distributions from the business. He acknowledged that the distributions are based on the estimated taxes and that the company has "never" hit it right on the exact number of the actual tax liability; for example in 2016, he received distributions of $137,625 to pay taxes of $133,143.

While Coslor was being questioned about Joel's 2016 personal tax return, it was pointed out by Jennifer's counsel that on the schedule E tax form there was a box that said nonpassive income from the K-1; counsel asked Coslor what the difference was between passive income and nonpassive income. Coslor responded that "nonpassive income means that the individual's active in the business, passive means that he's not active in the business." When asked if he knew for sure how much Joel actually received in distributions in 2016, Coslor stated, "The K-1 should be a good indication of how much he received . . . ."

Coslor explained that, with respect to non-S corporations, the Internal Revenue Service (IRS) has rules that allow it to assess a tax if the retained earnings exceed a certain amount. If a corporation's retained earnings exceed $250,000, the IRS can assess an additional tax, or penalty, for excessive earnings, but there are several exceptions (e.g., if the corporation needs to accumulate earnings for expansion, purchases of buildings, purchases of land, or a potential downturn in its cyclical business). Coslor confirmed that those rules do not apply to a corporation that has made a subchapter S election.

According to the evidence, Joel received wages, tips, and other compensation directly from GAS Electrical as follows: $75,000.11 in 2011, $46,250.12 in 2012, $50,000.09 in 2013, $50,961.62 in 2014, $50,000.07 in 2015, and $65,000.04 in 2016. Joel also testified that his salary did not increase from 2016 to 2017.

Joel's K-1's reflect the following amounts of his proportionate share of the S corporation's pass-through ordinary business income and distributions: 2011 income of $21,723, distribution of $13,150; 2012 income of $15,936, distribution of $46,633; 2013 income of $114,362, distribution of $61,375; and 2016 income of $399,649, distribution of $137,625. There were no K-1's offered or received with regard to 2014 or 2015, but Joel's schedule E shows $96,256 in nonpassive income (and "Section 179" expense of $2,350) from GAS

Electrical in 2014 and $195,902 in nonpassive income (and "Section 179" expense of $6,300) in 2015.

No corporate tax returns or financial statements of GAS Electrical were offered by either party.

In its order filed on April 20, 2018, and as relevant to this appeal, the district court had to determine what should be attributed to Joel as income for child support purposes. The court found that Jennifer did not meet her burden to prove that the retained earnings in GAS Electrical were "excessive or inappropriate" so as to be considered income for purposes of child support. The court stated, "Without evidence to what was reasonable for a Sub S corporation such [as] GAS Electrical . . . to retain under the circumstances, it is extremely difficult for the Court to determine that any earnings retained were excessive or inappropriate." The court noted case law that concluded it was appropriate to include in the obligor parent's income the distributions made to the parent to assist the parent in making estimated income tax payments; however, the district court presumed that was to allow averaging of income for a 3-year period, and in the instant case, there were no K-1's received into evidence for 2014 or 2015. The district court also found there was no evidence of the "in kind" value of the benefits Joel received from the company. Further, there was no evidence of the net monthly income received from SnyGut. The district court denied Jennifer's request for an upward modification of Joel's child support obligation.

Jennifer appeals.

## ASSIGNMENT OF ERROR

Jennifer assigns that the district court erred by denying her request to modify Joel's child support obligation.

## STANDARD OF REVIEW

[1] Modification of child support is entrusted to the discretion of the trial court. *Hotz v. Hotz*, 301 Neb. 102, 917 N.W.2d 467 (2018). An appellate court reviews proceedings for modification of child support de novo on the record and

will affirm the judgment of the trial court absent an abuse of discretion. *Id*.

[2,3] In a review de novo on the record, an appellate court reappraises the evidence as presented by the record and reaches its own independent conclusions with respect to the matters at issue. *Id*. A judicial abuse of discretion requires that the reasons or rulings of the trial court be clearly untenable insofar as they unfairly deprive a litigant of a substantial right and a just result. *Id*.

[4,5] Interpretation of the Nebraska Child Support Guidelines presents a question of law. *Hotz v. Hotz, supra*. When reviewing questions of law, an appellate court resolves the questions independently of the lower court's conclusions. *Id*.

## ANALYSIS

### General Principles of Law

[6] A party seeking to modify a child support order must show a material change in circumstances which (1) occurred subsequent to the entry of the original decree or previous modification and (2) was not contemplated when the decree was entered. *Fetherkile v. Fetherkile*, 299 Neb. 76, 907 N.W.2d 275 (2018). The Nebraska Child Support Guidelines establish a rebuttable presumption of a material change in circumstances when application of the guidelines "would result in a variation by 10 percent or more, but not less than $25, upward or downward, of the current child support obligation . . . due to financial circumstances which have lasted 3 months and can reasonably be expected to last for an additional 6 months." Neb. Ct. R. § 4-217.

[7] The Nebraska Child Support Guidelines provide that in calculating the amount of support to be paid, a court must consider the total monthly income. *Gangwish v. Gangwish*, 267 Neb. 901, 678 N.W.2d 503 (2004). See Neb. Ct. R. § 4-204 (rev. 2020). Total monthly income is defined as the

> income of both parties derived from all sources, except all means-tested public assistance benefits which includes

any earned income tax credit and payments received for children of prior marriages. This would include income that could be acquired by the parties through reasonable efforts. *For instance, a court may consider as income the retained earnings in a closely-held corporation of which a party is a shareholder if the earnings appear excessive or inappropriate.*

§ 4-204 (emphasis supplied).

[8,9] The Nebraska Supreme Court has not set forth a rigid definition of what constitutes income, but instead has relied upon a flexible, fact-specific inquiry that recognizes the wide variety of circumstances that may be present in child support cases. *Marshall v. Marshall*, 298 Neb. 1, 902 N.W.2d 223 (2017). Thus, income for the purposes of calculating child support is not necessarily synonymous with taxable income. *Id.* We take this flexible approach in determining a person's "income" for purposes of child support, because child support proceedings are, despite the child support guidelines, equitable in nature. *Marshall v. Marshall, supra.* Thus, a court is allowed, for example, to add "in-kind" benefits, derived from an employer or other third party, to a party's income. *Id.*

[10] "[T]he level of income should not be based on income that is 'speculative in nature and over which the employee has little or no control.'" *Noonan v. Noonan*, 261 Neb. 552, 560, 624 N.W.2d 314, 322 (2001) (quoting *Stuczynski v. Stuczynski*, 238 Neb. 368, 471 N.W.2d 122 (1991) (addressing overtime wages)). It is logical to extend the principles stated in *Stuczynski* to encompass forms of income other than overtime wages. *Noonan v. Noonan, supra.* Consequently, if the evidence shows that a party actually earns or can reasonably expect to earn a certain amount of income on a regular basis, it is appropriate to consider such income in calculating child support. *Id.*

[11,12] A small business corporation may elect to be an S corporation so long as it meets eligibility and other requirements as set forth in the Internal Revenue Code. See I.R.C.

§ 1361 et seq. (2018). Subchapter S is a tax status designed to tax corporate income on a pass-through basis to shareholders of a small business corporation. *Bortolotti v. Universal Terrazzo & Tile Co.*, 304 Neb. 219, 933 N.W.2d 851 (2019). Since a subchapter S corporation is not taxed on its earnings, the various income, expense, loss, credit, and other tax items pass through and are taxable to or deductible by shareholders in a manner analogous to that which is applicable to partners. *Schnackel v. Schnackel*, 27 Neb. App. 789, 937 N.W.2d 234 (2019). The tax treatment of subchapter S corporations has been outlined as follows:

"Although a [s]ubchapter S corporation may distribute income, it is not required to do so. [Citation omitted.] Earnings are owned by the corporation, not by the shareholders. [Citation omitted.] Subchapter S corporations may accumulate profits, referred to as 'retained earnings.' Retained earnings are the net sum of a corporation's yearly profits and losses. [Citation omitted.]

"Subchapter S status provides an alternate method of taxing a corporation's income. [Citation omitted.] In a [s]ubchapter S corporation, income tax is paid by the shareholders rather than by the corporation itself. [Citation omitted.] When the tax is paid by the individual, the corporation avoids income tax liability. [Citation omitted.]

"A [s]ubchapter S corporation allocates various items of income to shareholders based upon the shareholder's proportionate ownership of stock. [Citation omitted.] Allocations are itemized on an individual shareholder's . . . K-1. [Citation omitted.]"

*Coffey v. Coffey*, 11 Neb. App. 788, 806-07, 661 N.W.2d 327, 345 (2003) (quoting *In re Marriage of Brand*, 273 Kan. 346, 44 P.3d 321 (2002)).

OVERVIEW OF ALLEGED ERRORS

At the time of the divorce decree in 2004, Joel was attributed an earning capacity of $69,000 for purposes of calculating

child support. His salary in the years leading up to the modification trial was as follows: $75,000 (2011), $46,250 (2012), $50,000 (2013), $50,961 (2014), $50,000 (2015), $65,000 (2016), $65,000 (2017). At the time of trial in March 2018, Joel's salary from GAS Electrical was still $65,000 per year. Thus, there was no material change in circumstances warranting a modification of child support based upon Joel's salary alone.

However, GAS Electrical was created after the parties' divorce, and therefore in addition to earning a salary, Joel had the ability to also benefit from the corporation's earnings. Based on Joel's federal income tax returns, his 50-percent share of the pass-through taxable income from GAS Electrical was as follows: $21,106 (2011), $15,936 (2012), $114,362 (2013), $93,906 (2014), $189,602 (2015), and $381,182 (2016). These figures are taken from Joel's federal tax returns, specifically the S corporation income reported on form 1040 at line 17 and the associated schedule E. The tax returns show a significant increase in GAS Electrical's ordinary business income after 2012, some of which the corporation distributed to its shareholders, but some of which it retained. The district court concluded the evidence did not support attributing to Joel for child support purposes any income beyond his salary. Jennifer claims the district court erred by not factoring into Joel's income the nonpassive income/retained earnings, distributions, and "in-kind" benefits Joel received from GAS Electrical, as well as the rental income he received from SnyGut.

## Nonpassive Income/Retained Earnings

Jennifer contends the district court "abused its discretion by not considering Joel's nonpassive income." Brief for appellant at 6. As explained by Coslor, nonpassive income means that the individual is active in the business and passive income means the individual is not active in the business. In this case, Joel was actively involved in GAS Electrical, and

thus, the S corporation's pass-through income was characterized as nonpassive income on schedule E of Joel's personal federal tax returns. Jennifer acknowledges that "the evidence indicated Joel's nonpassive income was retained by the [c]orporation and not actually received," but "the retained earnings were nevertheless excessive and inappropriate," brief for appellant at 8, and the district court should have considered such retained earnings which Jennifer claims Joel "sheltered in the [c]orporation," *id*. at 12.

We view Jennifer's argument to be focused on the inclusion of earnings retained by the S corporation when determining Joel's income for child support purposes. Although Jennifer suggests we do so, we find it unnecessary to consider any distinction between nonpassive income and passive income for child support purposes in this instance, other than noting that the nonpassive nature of the income at issue here indicates active involvement by Joel in producing that income. The issue in this case is not whether S corporation pass-through income is characterized as nonpassive or passive, but, rather, the issue is how much of that pass-through income is actually distributed to the shareholder and whether any income not distributed by the corporation is retained for legitimate business purposes. As set forth in the Nebraska Child Support Guidelines, "a court may consider as income the retained earnings in a closely-held corporation of which a party is a shareholder if the earnings appear excessive or inappropriate." § 4-204. Whether retained earnings are excessive or inappropriate necessarily implies that such earnings are not being retained for legitimate business purposes and could otherwise reasonably be expected to be distributed to a parent-shareholder for inclusion as income for child support purposes. Important to this issue is consideration of how much control Joel has over the income distribution and retention decisions as an equal owner of the S corporation, as well as whether the evidence supports that any retained earnings were excessive or inappropriate.

Jennifer points out that in *Coffey v. Coffey*, 11 Neb. App. 788, 661 N.W.2d 327 (2003), this court addressed passive earnings from a subchapter S corporation for purposes of calculating child support. The mother in that case had a 1.093874-percent ownership interest in a subchapter S corporation and had an ownership interest in a family partnership of approximately 20 percent for profit-and-loss sharing and 1 percent for her ownership of capital. She testified that her tax returns reflected subchapter S corporation income that she did not receive; she did receive money from the corporation to pay her quarterly tax estimates. The mother did not have any control over distributions from the corporation or the family partnership, she never knew if she was getting a distribution, and sometimes she did not receive a distribution. This court held that it was error to include passive income from the closely held corporation and family partnership in computing the mother's income where the passive income did not represent income that the mother earned or could reasonably expect to earn and where there was no evidence of retained earnings or that any retained earnings were excessive or inappropriate. See, also, *Pickrel v. Pickrel*, 14 Neb. App. 792, 717 N.W.2d 479 (2006) (father incorporated his farming operation and was president, as well as sole shareholder and employee of corporation; because there was no evidence from which to conclude retained earnings of closely held corporation were excessive or inappropriate, it was abuse of discretion to include retained earnings in calculation of father's income).

Because there is limited guidance on this issue within Nebraska's jurisprudence, we find it helpful to consider how other courts have handled similar situations. In *J.S. v. C.C.*, 454 Mass. 652, 912 N.E.2d 933 (2009), the Massachusetts Supreme Judicial Court addressed, as a matter of first impression, how to treat undistributed earnings from an S corporation for purposes of determining a parent's child support obligation; the father in that case was a 65-percent owner of an S corporation. The court stated:

Neither this court nor the Appeals Court has directly addressed how to treat, for purposes of determining a parent's child support obligation, undistributed earnings of an S corporation that for income tax purposes are attributable to the parent-shareholder. . . .

Courts in a number of other jurisdictions have considered how to treat the retained earnings of an S corporation that are passed through to a shareholder for purposes of measuring and imposing a child support obligation. In our view, the better reasoned decisions require a case-specific, factual inquiry and determination . . . .

We follow the lead of these cases, and similarly conclude that a determination whether and to what extent the undistributed earnings of an S corporation should be deemed available income to meet a child support obligation must be made based on the particular circumstances presented in each case. Such a fact-based inquiry is necessary to balance, inter alia, the considerations that a well-managed corporation may be required to retain a portion of its earnings to maintain corporate operations and survive fluctuations in income, but corporate structures should not be used to shield available income that could and should serve as available sources of child support funds. . . .

Without undertaking to provide an exhaustive list, we note some relevant factors that the judge should weigh in determining what portion of undistributed corporate earnings may be available to a shareholder for a child support obligation. First, a shareholder's level of control over corporate distributions—as measured by the shareholder's ownership interest—is a factor of substantial importance. . . .

Second, the judge should evaluate the legitimate business interests justifying retained corporate earnings. . . .

Third, the judge should weigh affirmative evidence of an attempt to shield income by means of retained

earnings. . . . In that regard, the corporation's history of retained earnings and distributions may be relevant.

*J.S. v. C.C.*, 454 Mass. at 661-64, 912 N.E.2d at 941-43.

[13] We agree that any determination whether and to what extent the undistributed earnings of an S corporation should be deemed available income to a parent-shareholder for child support purposes must be based on the particular circumstances presented in each case. In Nebraska, there is no presumptive rule that retained earnings should be included as income, nor is there a blanket rule that precludes retained earnings from being considered for child support purposes. Rather than a "rigid definition of what constitutes income" in child support cases, "we have relied upon a flexible, fact-specific inquiry that recognizes the wide variety of circumstances that may be present." *Marshall v. Marshall*, 298 Neb. 1, 23, 902 N.W.2d 223, 240 (2017).

[14] Other jurisdictions likewise avoid a blanket rule when considering whether to include retained earnings from S corporations for child support purposes. See *In re Marriage of Brand*, 273 Kan. 346, 44 P.3d 321 (2002) (courts reluctant for policy reasons to have blanket rule that subchapter S corporation retained earnings are not income when calculating child support because it would encourage shareholders to retain earnings in favor of their own long-term financial interests without regard for child support). Thus, as held by the Massachusetts Supreme Judicial Court, and as is consistent with Nebraska's jurisprudence on determining income in child support cases, we conclude that a fact-specific inquiry is necessary to balance considerations that a well-managed corporation may be required to retain a portion of its earnings to maintain corporate operations and survive fluctuations in income, but that corporate structures should not be used to shield available income that could and should serve as available sources of child support funds.

[15] Further, we agree that relevant factors to weigh in determining what portion of undistributed corporate earnings

may be available to a shareholder for child support purposes should include the following considerations: (1) the shareholder's level of control over the corporation's distributions—as measured by the shareholder's ownership interest, (2) the legitimate business interests justifying the retained corporate earnings, and (3) the corporation's history of retained earnings and distributions to determine whether there is any affirmative evidence of an attempt to shield income by means of retained earnings. See *J.S. v. C.C.*, 454 Mass. 652, 912 N.E.2d 933 (2009). A significant amount of retained earnings does not by itself establish an attempt to shield income. See, e.g., *Trojan v. Trojan*, 208 A.3d 221 (R.I. 2019) (father was sole shareholder of S corporation drywall business; income of approximately $1 million retained for working capital and equity necessary for bonding purposes determined to be legitimate business purpose and not to shield or manipulate father's income in effort to reduce or avoid child support obligation; and neither retained earnings nor distributions used to pay taxes on pass-through income considered for child support purposes).

[16] The district court in this case, citing to *Noonan v. Noonan*, 261 Neb. 552, 624 N.W.2d 314 (2001), concluded that it was Jennifer's burden to prove what earnings were actually retained and whether any retained earnings were excessive and inappropriate. In *Noonan*, which was also a child support modification action, the Nebraska Supreme Court held that "if the evidence shows that a party actually earns or can reasonably expect to earn a certain amount of income on a regular basis, it is appropriate to consider such income in calculating child support." 261 Neb. at 560-61, 624 N.W.2d at 322. "Therefore, if the moving party shows that the nonmoving party earns or can reasonably expect to earn a certain amount of income on a regular basis, a rebuttable presumption of including such income arises under the Guidelines." *Noonan v. Noonan*, 261 Neb. at 561, 624 N.W.2d at 322-23. At that point, "the nonmoving party must produce sufficient evidence to rebut the presumption that the application of the

Guidelines will result in a fair and equitable child support order before deviation from the Guidelines is appropriate." *Noonan v. Noonan*, 261 Neb. at 561, 624 N.W.2d at 323. "Thus, if the nonmoving party can show that the included income is speculative in nature and over which the person has little or no control, [citation omitted], the presumption of including the income is rebutted and it shall be excluded from the calculation." *Id*.

The evidence established that in addition to Joel's salary, which was $65,000 at the time of trial, Joel's 50-percent share of the pass-through income and his distributions from GAS Electrical were as follows:

| Year | S corporation pass-through income | Distribution to Joel (per K-1's) |
|------|-----------------------------------|----------------------------------|
| 2011 | $21,106 | $13,150 |
| 2012 | $15,936 | $46,663 |
| 2013 | $114,362 | $61,375 |
| 2014 | $93,906 | Unknown (no K-1 or testimony) |
| 2015 | $189,602 | Unknown (no K-1 or testimony) |
| 2016 | $381,182 | $137,625 |

According to Joel, the distributions were estimated to cover his personal tax liability associated with the corporation's pass-through income. Using the 2016 distribution as an example, the record supports that most of that $137,625 distribution would have been necessary to cover Joel's federal and state tax liabilities (totaling $133,143, but which we note included personal taxes owed related to noncorporate income as well). The distribution of $137,625 indicates that approximately $243,557 ($381,182 income − $137,625 distribution) of Joel's share of the pass-through income was not distributed to Joel and was therefore retained by the corporation. However, minimal evidence was offered to establish whether retaining such a substantial amount of earnings was excessive or inappropriate, and that as such, Joel could therefore

reasonably expect to receive a certain amount of those earnings on a regular basis.

Coslor attempted to provide some guidance on the issue. When asked how one would determine whether retained earnings were excessive or inappropriate, Coslor explained that with respect to non-S corporations, the IRS has rules that allow it to assess a tax if the retained earnings exceed a certain amount. If a corporation's retained earnings exceed $250,000, the IRS can assess an additional tax, or penalty, for excessive earnings, but there are several exceptions (e.g., if the corporation needs to accumulate earnings for expansion, purchases of buildings, purchases of land, or a potential downturn in its cyclical business). Coslor confirmed that those rules do not apply to a corporation that has made a subchapter S election.

Joel testified that he and Snyder, the other 50-percent shareholder of GAS Electrical, determine their salaries (both receive the same salary) and that both decide how much income will be retained in the business. There is no question that although Joel's control is equal with that of Snyder, Joel nevertheless has the ability to exercise significant control over the undistributed corporate earnings. As noted previously, this is an important factor when considering whether some of those undistributed earnings should be attributed to Joel for child support purposes. However, Joel testified that 2016 was an "exceptional year" and was the "best year [they] had in business." Joel acknowledged that he did not give himself a raise from 2016 to 2017 despite having that "exceptional year." No questions were asked of Joel regarding what, if any, legitimate business reasons he and Snyder had to justify retaining a large portion of the 2016 corporate earnings. Additionally, no evidence was presented to provide the corporation's history of retained earnings and distributions to consider whether Joel was attempting to shield income from being considered for child support purposes by means of retaining corporate earnings.

The district court found that "[t]he balance of GAS Electrical['s] ordinary business income, after equal distributions to the owners to pay their estimated income taxes, remained with the corporation for purposes not identified." The district court further found, however, that it was "unclear how much in the way of ordinary business income was actually retained by GAS Electrical . . . on its books in each of the . . . tax years." Citing to *Coffey v. Coffey*, 11 Neb. App. 788, 661 N.W.2d 327 (2003), the district court noted that many factors need to be considered when determining what amounts of an S corporation's income should be included for child support purposes, such as the past earnings history of the corporation, ownership share, and the shareholder's ability to control the distribution. And as this court stated in *Coffey*, "heightened scrutiny [should be] given to cases where income can be manipulated due to the ability to control distributions." 11 Neb. App. at 807, 661 N.W.2d at 346.

The district court noted that the burden of proof in an action for child support modification lies with the party seeking the modification and that Jennifer had the initial burden to establish the retained earnings were excessive or inappropriate. The court concluded, "There was nothing in the evidence to establish that . . . it was the regular practice of this corporation to retain excessive and inappropriate earnings, for such purposes as sheltering those retained earnings from consideration in Joel's income for determination of child support."

Jennifer acknowledges that *Coffey v. Coffey, supra*, and *Pickrel v. Pickrel*, 14 Neb. App. 792, 717 N.W.2d 479 (2006), suggest that she has the burden to prove the retained earnings are excessive or inappropriate, but that this court "should clarify the rule." Brief for appellant at 8. She asserts that "once the moving party establishes the retained earnings are presumptively excessive or inappropriate, a rebuttable presumption of including such income arises," and the burden then shifts to the "nonmoving party to prove the retained earnings were necessary and not excessive." *Id*. There is no need for rule

clarification, as Jennifer correctly sets forth the burden shifting noted in *Noonan v. Noonan*, 261 Neb. 552, 624 N.W.2d 314 (2001), that if a moving party shows that the nonmoving party earns or can reasonably expect to earn a certain amount of income on a regular basis, it is a rebuttable presumption that such income should be considered for child support purposes. However, the evidence in this case was insufficient to establish the initial rebuttable presumption that the retained earnings were excessive or inappropriate, and that as such, Joel could reasonably expect to receive a certain amount of those undistributed earnings on a regular basis.

In order to establish a rebuttable presumption that a corporation's retained earnings are excessive or inappropriate, the evidence must include more than simply submitting personal tax returns and a portion of the shareholder's K-1's. Although the evidence demonstrated that 2016 was an "exceptional year" and that a substantial portion of GAS Electrical's earnings were retained, there was no evidence regarding why such earnings were retained, much less any suggestion that they were necessarily excessive or inappropriate. As previously noted, a well-managed corporation may be required to retain a portion of its earnings to maintain corporate operations and survive fluctuations in income. In this case, there was evidence that GAS Electrical had 9 to 12 employees at the time of trial, but has had up to 32 employees. No inquiry was made of Joel about such fluctuations or potential future growth or needs of the corporation. There were no corporate tax returns, no financial statements, an incomplete set of K-1's, and no testimony from either Joel, the corporation's accountant, or an expert witness. In other words, there was no evidence to provide insight on the corporation's natural financial cycles or on the actual retained earnings from year-to-year and for what legitimate business purposes the corporation retained those earnings. The lack of such evidence precluded the type of fact-specific inquiry necessary to determine whether such retained earnings were presumptively excessive or inappropriate, and that as

such, Joel could therefore reasonably expect to receive a cer-
tain amount of those earnings on a regular basis.

Nevertheless, Jennifer contends that the retained earnings
should be considered regardless of whether they were exces-
sive or inappropriate. She relies on *Gangwish v. Gangwish*,
267 Neb. 901, 678 N.W.2d 503 (2004). The court in *Gangwish*
did not specifically address retained earnings of the corpora-
tion, but, rather, it talked only of the income or earnings of the
corporation and the appropriateness of considering corporate
income in setting child support. According to *Gangwish*, under
the appropriate factual circumstances, equity may require a
trial court to calculate a party's income by looking through
the legal structure of a closely held corporation of which the
party is a shareholder. An example of such a case may be when
the shareholder takes a depressed salary, but the corporation
pays the day-to-day living expenses of the shareholder. See *id.*
(father in *Gangwish* took $6,000-per-year salary from his farm
corporation, but corporation owned parties' home and paid par-
ties' living expenses).

Unlike the circumstances in *Gangwish*, there is no evidence
that Joel took a depressed salary. However, we do note that
given the substantial retained earnings in 2016, and depending
on the corporation's earnings since that time, Joel's unwill-
ingness to increase his salary despite corporate earnings con-
tinuing on an upward trend may support a different outcome
in the future. This is especially a concern given Joel's equal
control with Snyder over such matters. Further, there was no
evidence that the corporation paid Joel's day-to-day living
expenses, as in *Gangwish*. We will discuss Joel's "in-kind"
benefits later.

In sum, Jennifer did not meet her burden to prove the
retained earnings of GAS Electrical were presumptively exces-
sive or inappropriate, and that as such, Joel could therefore
reasonably expect to receive a certain amount of those earnings
on a regular basis. Accordingly, the district court did not abuse

its discretion by declining to include the corporation's retained earnings in the calculation of Joel's income.

## DISTRIBUTIONS TO PAY TAXES

Jennifer argues that the district court erred by not considering the distributions Joel receives from GAS Electrical. See *Coffey v. Coffey*, 11 Neb. App. 788, 661 N.W.2d 327 (2003) (funds used by mother to pay estimated tax liability for S corporation and family partnership for 3 years came from corporation and family partnership, and it was appropriate to include such in mother's income; because income amounts varied significantly, it was appropriate to average; and no petition for further review filed). She contends that "[t]he facts in this case are synonymous with the facts in *Coffey*." Brief for appellant at 16.

However, since this court's opinion in *Coffey*, several other jurisdictions have addressed distributions made to shareholders in order to offset the shareholder's proportionate share of the taxes on the S corporation's earnings. Those jurisdictions have determined that distributions to cover corporate tax liability should not be included as income for purposes of calculating child support. A list of those cases can be found in *Bornhorst v. Bornhorst, post* p. 182, ___ N.W.2d ___ (2020), released the same day as this opinion.

[17] In *Bornhorst v. Bornhorst, supra*, we held that distributions made to a shareholder of a subchapter S corporation, as reported on a K-1, should not be included as income for purposes of calculating child support for those portions of the distribution intended to offset the shareholder's personal tax liability on his or her proportionate share of the S corporation's pass-through earnings. However, if the evidence establishes that the total distribution exceeds the shareholder's tax liability on his or her proportionate share of the S corporation's pass-through earnings, such excess portions of the distribution may be included as income for child support purposes unless the evidence demonstrates that such excess

amounts are reasonably expected to be applied to future tax liabilities. *Id*. We added that an analysis correlating a shareholder's distributions to his or her tax liabilities over a longer period of time may reveal a regular pattern of excess distributions which cannot be solely tied to the tax liabilities associated with the S corporation's pass-through income. *Id*. In such cases, the amount of a shareholder's distribution which exceeds the correlated tax liability for an S corporation's pass-through income may be subject to inclusion as income for child support purposes. *Id*.

In the present case, Joel testified that he received distributions from GAS Electrical to pay his estimated tax liability for his share of the S corporation's pass-through income. The distributions are reflected on his K-1's. Joel acknowledged that the distributions are based on the estimated taxes and that the estimates have "never" equaled the actual tax liability; for example in 2016, he received distributions of $137,625 to pay taxes of $133,143. The record does not contain K-1's for 2014 or 2015 showing what distributions were made to Joel. Jennifer did not ask Joel or call another witness from GAS Electrical to inquire about Joel's distributions for 2014 and 2015.

Jennifer argues that the 2014 and 2015 distributions would equal at least what the taxes were on Joel's tax returns for those years. Assuming this to be true—that his distribution equaled his proportionate share of the corporate tax liability—there would still be no excess distribution amount that could be counted as income for 2014 or 2015. As for 2016, the testimony at trial was that Joel received distributions of $137,625 to pay taxes of $133,143. (We note that $133,143 represents Joel's total tax liability and is not solely reflective of his tax liability on the corporation's pass-through income. The total tax liability also included the personal tax liability of Joel and his current wife for their wages or other income.) In her brief, Jennifer stated that in 2016, Joel received a distribution of $137,625 and his "total federal and state tax liability was $93,051.00." Brief for appellant at 16. However, we note that

the $93,051 was not Joel's total tax, but, instead, it reflected the outstanding amount owed, i.e., the amount of federal and state taxes underpaid that year and thus still due and owing to the government entity; furthermore, that amount was not solely reflective of the corporate tax liability as it also included the personal tax liability of Joel and his current wife.

Neither party provided direct testimony or other evidence as to what portion of Joel's 2016 total personal tax liability was related specifically to his share of the S corporation's pass-through income. Because evidence was not produced distinguishing Joel's tax liability associated with his share of the S corporation's pass-through income from his tax liability stemming from other sources of income, the determination of what might constitute an excess amount of distribution in 2016 was not possible on this record. Further, because of the fluctuating nature of a corporation's income and the resulting tax liabilities and estimated distributions being made from year to year, averaging of any proven excess distributions would be appropriate. In this case, averaging would not have been possible, because the K-1's for 2014 and 2015 were not produced, and therefore confirmation of actual distributions made in those years was not possible. Accordingly, the district court did not abuse its discretion when it did not include the distributions in the calculation of Joel's income.

### Other Benefits to Joel

Joel said that GAS Electrical pays a percentage of insurance premiums and provides him a company vehicle (and pays for fuel, tires, and all vehicle expenses), a company credit card ("[f]or road expenses on fuel only and whatever material [he] might have to do"), and a cell phone. There was no evidence offered on the value of any of these benefits, aside from the insurance premiums; and it is not unusual for a company to pay a portion of an employee's premiums. While a court is allowed to add "in-kind" benefits derived from an employer or other third party to a party's income, a "'"court's

findings regarding [an individual's] level of income should not be based on the inclusion of income that is entirely speculative in nature."'" *Armknecht v. Armknecht*, 300 Neb. 870, 879, 916 N.W.2d 581, 589 (2018). Given the speculative nature of the nonwage benefits, we cannot say that the district court erred in excluding those items in the calculation of Joel's income.

### SNYGUT

Jennifer claims that Joel earns $600 per month in rental income from SnyGut which should have been considered in determining Joel's income for child support purposes. Joel acknowledged that his annual percentage of the rental income is $7,200, "[m]inus whatever maintenance and all that [sic] other fees would be." However, on cross-examination, he said that the rent is paid to SnyGut and that the $7,200 was not paid to him. Because there is no evidence as to what Joel's actual rental income is after maintenance and other fees, his income from SnyGut is speculative. Accordingly, the district court did not abuse its discretion by not including the rental income in the calculation of Joel's income.

### JOEL'S TOTAL INCOME

Based on the evidence presented at trial, Joel's salary of $65,000 per year is the only amount that can properly be included in the calculation of his income. Because this is less than the $69,000 earning capacity attributed to him at the time of the decree, Jennifer has failed to prove a material change in circumstances warranting an upward modification of Joel's child support obligation.

### CONCLUSION

For the reasons stated above, we affirm the decision of the district court denying Jennifer's request for an upward modification of Joel's child support obligation.

AFFIRMED.