Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
09/22/2020 09:07 AM CDT

Cantrell R. Harrison, appellee, v.
Dennis R. Harrison, appellant.
___ N.W.2d ___

Filed September 15, 2020.    No. A-19-440.

1. **Rules of the Supreme Court: Appeal and Error.** The cross-appeal section of an appellate brief must set forth a separate title page, a table of contents, a statement of the case, assigned errors, propositions of law, and a statement of the facts.

2. ____: ____. Where a party's brief fails to comply with the mandate of the appellate rule governing the form and content thereof, an appellate court may proceed as though the party failed to file a brief or, alternatively, may examine the proceedings for plain error.

3. **Divorce: Child Custody: Child Support: Property Division: Alimony: Attorney Fees: Appeal and Error.** In an action for the dissolution of marriage, an appellate court reviews de novo on the record the trial court's determinations of custody, child support, property division, alimony, and attorney fees; these determinations, however, are initially entrusted to the trial court's discretion and will normally be affirmed absent an abuse of that discretion.

4. **Appeal and Error.** Plain error is error plainly evident from the record and of such a nature that to leave it uncorrected would result in damage to the integrity, reputation, or fairness of the judicial process.

5. ____. To be considered by an appellate court, an alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error.

6. **Judgments: Receivers: Appeal and Error.** A trial court's determination of who should bear the expenses associated with the receivership will not be disturbed on appeal absent an abuse of discretion.

7. **Divorce: Attorney Fees.** In awarding attorney fees in a dissolution action, a court shall consider the nature of the case, the amount involved in the controversy, the services actually performed, the results obtained, the length of time required for preparation and presentation of the case,

the novelty and difficulty of the questions raised, and the customary charges of the bar for similar services.

8. **Attorney Fees: Proof: Affidavits: Records: Appeal and Error.** The filing of an affidavit or presentation of other evidence will always be the preferable way to support the award of attorney fees, but if the contents of the record show the allowed fee not to be unreasonable, then that fee would not be untenable or an abuse of discretion.

9. **Child Support: Rules of the Supreme Court: Words and Phrases.** The Nebraska Child Support Guidelines provide that in calculating the amount of support to be paid, a court must consider the total monthly income, which is defined as the income of both parties derived from all sources, except all means-tested public assistance benefits which includes any earned income tax credit and payments received for children of prior marriages and includes income that could be acquired by the parties through reasonable efforts.

10. **Child Support: Rules of the Supreme Court.** The Nebraska Supreme Court has not set forth a rigid definition of what constitutes income, but instead has relied upon a flexible, fact-specific inquiry that recognizes the wide variety of circumstances that may be present in child support cases.

11. **Child Support: Taxation: Equity: Rules of the Supreme Court.** Income for the purposes of calculating child support is not necessarily synonymous with taxable income. A flexible approach is taken in determining a person's income for purposes of child support, because child support proceedings are, despite the child support guidelines, equitable in nature.

12. **Taxation: Corporations: Words and Phrases.** Subchapter S is a tax status designed to tax corporate income on a pass-through basis to shareholders of a small business corporation.

13. **Corporations.** Although a subchapter S corporation may distribute income, it is not required to do so.

14. ____. Earnings are owned by the corporation, not by the shareholders.

15. ____. Subchapter S corporations may accumulate profits, referred to as "retained earnings."

16. **Taxation: Corporations.** Since a subchapter S corporation is not taxed on its earnings, the various income, expense, loss, credit, and other tax items pass through and are taxable to or deductible by shareholders in a manner analogous to that which is applicable to partners.

17. **Child Support: Corporations: Taxes: Evidence: Proof.** Distributions made to a shareholder of a subchapter S corporation, as reported on a Schedule K-1, should not be included as income for purposes of calculating child support for those portions of the distribution intended to

offset the shareholder's personal tax liability on his or her proportionate share of the S corporation's pass-through earnings. However, if the evidence establishes that the total distribution exceeds the shareholder's tax liability on his or her proportionate share of the S corporation's pass-through earnings, such excess portions of the distribution may be included as income for child support purposes unless the evidence demonstrates that such excess amounts are reasonably expected to be applied to future tax liabilities.

18. **Child Support: Corporations.** A fact-specific inquiry is necessary to balance considerations that a well-managed corporation may be required to retain a portion of its earnings to maintain corporate operations and survive fluctuations in income, but corporate structures should not be used to shield available income that could and should serve as available sources of child support funds.

19. ____: ____. Relevant factors to weigh in determining what portion of undistributed corporate earnings may be available to a shareholder for child support purposes should include the following considerations: (1) the shareholder's level of control over the corporation's distributions—as measured by the shareholder's ownership interest, (2) the legitimate business interests justifying the retained corporate earnings, and (3) the corporation's history of retained earnings and distributions to determine whether there is any affirmative evidence of an attempt to shield income by means of retained earnings.

20. **Child Support: Corporations: Proof.** The key to determining whether depreciation deductions should be included as income for child support purposes is to show to the court that the deduction does not represent artificial treatment of assets for the purpose of avoiding child support obligations.

21. **Child Support: Corporations.** When a husband and wife hold an equal interest and are both active in business entities during the course of their marriage, the risk of artificial treatment of assets for the purpose of avoiding child support obligations does not exist.

Appeal from the District Court for Fillmore County: VICKY L. JOHNSON, Judge. Affirmed in part, and in part reversed and remanded with directions.

Erik C. Klutman, of Sipple, Hansen, Emerson, Schumacher, Klutman & Valorz, for appellant.

Steven B. Fillman, of Fillman Law Offices, L.L.C., and Joseph H. Murray, of Murray Law, P.C., L.L.O., for appellee.

Pirtle, Bishop, and Arterburn, Judges.

Bishop, Judge.

## I. INTRODUCTION

In this marriage dissolution action, Dennis R. Harrison appeals the Fillmore County District Court's calculation of his child support obligation. He contends that the net profits and depreciation deductions of the parties' equally owned businesses should not have been added to his income when calculating child support. Dennis also challenges the district court's decision to overrule his motion to reopen the case, as well as the court's order of temporary alimony, receivership fees, and temporary attorney fees. Cantrell R. Harrison attempts to cross-appeal the district court's calculation of Dennis' child support obligation. We affirm in part, and in part reverse and remand with directions.

## II. BACKGROUND

Dennis and Cantrell were married in 2002, and they have two children—a daughter born in 2003 and a son born in 2005.

During their marriage, Dennis and Cantrell established Custom Pumping Solutions, L.L.C. (CPS), with each of them owning 50 percent of the business. CPS pumps lagoon manure onto farmland for organic fertilizer. Dennis and Cantrell also each owned a 50-percent interest in C & D Leasing, L.L.C. (C & D Leasing). C & D Leasing purchases equipment and then leases it to CPS. Additionally, Dennis owned 50 percent of another business, S&H Bushwackers; Cantrell's father owned the other 50 percent. And Cantrell owns shares of stock in Stokebrand Seed, Inc. (Stokebrand Seed), a corporation owned by her family.

Cantrell filed for divorce in December 2016, and she filed an amended complaint in May 2018. In both pleadings, she alleged that she was a fit and proper person to have custody of the children and asked that the district court enter a custody and parenting time order. She also asked that child support be awarded in conformity with the Nebraska Child Support

Guidelines. Cantrell sought an equitable division of the parties' property and debts and an award of attorney fees. Dennis' responsive pleading also asked the court to equitably divide the parties' assets and debts and enter a custody and parenting time order.

The parties filed a joint temporary stipulation in January 2017. Pursuant to the temporary stipulation, the parties were to have joint legal custody of their children, with primary physical custody going to Cantrell, subject to Dennis' specified parenting time. Dennis would also pay child support in the amount of $600 per month for the two children until further order of the court. The district court filed a temporary order approving the parties' stipulation and ordering the same.

In February 2018, Cantrell filed a motion for temporary relief, alleging that Dennis was making purchases on behalf of the parties' companies without her permission or agreement. Cantrell alleged that Dennis was "attempting to manipulate the net worth of the business assets he expects to receive by intentionally buying assets that depreciate almost instantaneously upon purchase." She was also "concerned" that Dennis was "depleting the cash assets of the marital estate that could be used to effectuate a property equalization." She asked the district court to enter a temporary order barring the purchase of assets over $5,000 without the written consent of both parties, as well as an "anti-hypothecating order" barring the sale of assets, disposal of assets, and dissipation of large amounts of cash assets of the marital estate without the written consent of both parties. In its order filed on February 13, the district court ordered, in part, that during the pendency of the action, business purchases over $10,000, with the exception of fuel bills, shall be agreed upon in writing by both parties.

In May 2018, Cantrell filed a motion for temporary spousal support. Cantrell also filed a motion for appointment of receiver, for accounting, for other relief, and for attorney fees. In this second motion, Cantrell alleged that Dennis was using funds from the parties' companies for his personal expenses

and to make a loan to his uncle, all without her authorization; he was fraudulently diverting revenue and earnings from the companies; and he was "systematically cutting" her out of CPS without authority, including changing passwords and emails, as well as firing her from her duties at CPS.

In a journal entry and order filed on July 10, 2018, the district court stated that the parties had reached an agreement on several issues. As relevant to this appeal, the order states that Cantrell withdrew her application for temporary spousal support or alimony in consideration of Dennis' agreement that she continue to be paid her salary from CPS; the court considered the application for temporary spousal support withdrawn and ordered the continued payment of Cantrell's salary.

After a hearing on August 16, 2018, the district court filed a journal entry appointing a receiver for CPS and C & D Leasing; CPS was to deposit $7,500 with the clerk of the court to cover the receiver's expenses. Additionally, the court awarded Cantrell $5,000 in attorney fees.

On October 31, 2018, the parties entered into a mediated agreement and reached a settlement on property division issues and alimony. As relevant to this appeal, Cantrell received all interest in Stokebrand Seed. Dennis received CPS, C & D Leasing, and the parties' marital share of S&H Bushwackers; he was to pay any indebtedness to any creditor of CPS and C & D Leasing. As an equalization, Dennis was to pay Cantrell $100,000 within 60 days of the date of the decree and $456,000 in annual installments of $38,000 each due March 1 of each year beginning in 2020; one half of the $456,000 ($228,000 total or $19,000 per year) was to be considered alimony, which would not terminate on the remarriage of Cantrell, but would terminate on the death of either party. Each party was to pay the balance of any attorney fees owed to their respective attorneys. The parties submitted the mediated agreement to the district court for approval; it was approved pursuant to the court's journal entry and order dated November 8, 2018, wherein the parties were ordered and directed to carry out the terms of the

agreement. The parties did not resolve the issues of child custody, child support, and related matters. Those issues remained scheduled for trial at the end of November.

Trial took place on November 30, 2018. The court was informed that the parties had agreed to joint legal custody of their children, with physical custody going to Cantrell. The parties also agreed that Dennis' parenting time would include alternating weekends. Additional parenting time issues, including summer and holiday parenting time, were still at issue. Child support and related matters were also at issue. We will discuss the trial evidence relevant to the errors assigned in our analysis below.

A partial journal entry and decree of dissolution of marriage was filed on December 21, 2018; some matters remained under advisement. As relevant to this appeal, the district court awarded the parties joint legal custody of their children, with physical custody awarded to Cantrell; parenting time and child support were taken under advisement, as was any determination related to the parties' obligations to provide health insurance for the children. The court ordered that Cantrell was entitled to claim the parties' daughter, and Dennis was entitled to claim the parties' son, as an exemption on income tax returns each calendar year; when there was only one exemption remaining, the parties were to alternate years. A copy of the parties' mediated agreement, which was approved by the court on November 8, was attached and incorporated into the decree, and the parties were ordered and directed to carry out the terms of the agreement. Additionally, the court ordered that "[a]ll unsatisfied temporary orders of this Court entered during the pendency of this action shall survive the entry of this decree . . . ," specifically the obligation for payment of attorney fees entered on August 16, continuation of Cantrell's salary entered on July 10, and payment of the expenses of the receiver entered on August 16 "shall remain in full force and effect until satisfied"; "[i]n the case of the order providing for continuation of

[Cantrell's] salary, that shall terminate upon entry of a final decree herein."

On January 14, 2019, Dennis filed a motion to reopen the case "and present evidence as to the sole issue of [straight-line] depreciation of the equipment" of CPS and C & D Leasing for purposes of calculating child support. Cantrell filed an objection to the motion. After a hearing, the district court denied Dennis' motion to reopen evidence.

A final journal entry and decree of dissolution of marriage was filed on April 11, 2019. The district court noted that on November 5, 2018, it had approved the parties' mediated agreement resolving all pending issues with respect to property distribution, debt allocation, equalization, alimony, and attorney fees and that the terms of such agreement were to be included in the final decree of dissolution entered herein. The court reiterated its award of joint legal custody, with physical custody awarded to Cantrell. This time, however, the court attached and incorporated a parenting plan that specified Dennis' parenting time and established holiday and summer parenting time.

Additionally, as relevant to this appeal, the district court ordered Dennis to pay Cantrell child support in the amount of $2,553 per month for the two children. When determining Dennis' income for child support purposes, the district court included Dennis' W-2 wages from CPS, CPS' ordinary business income with depreciation added back in, and the net rental income of C & D Leasing with depreciation added back in. Dennis' income from the foregoing sources was calculated for each year from 2015, 2016, and 2017, and the 3-year average was used to determine Dennis' total monthly income of $21,120 per month. The court determined Cantrell's earning capacity was $2,080 per month, based on a 40-hour workweek and a $12 hourly wage. Dennis was ordered to maintain health insurance for the parties' children and was given a $300 credit on the child support calculation worksheet for the health insurance premiums for the children.

Dennis appeals and Cantrell attempts to cross-appeal the district court's decree.

## III. ASSIGNMENTS OF ERROR

Dennis assigns, summarized and reordered, that the district court erred in (1) ordering temporary alimony to continue until the entry of the April 2019 decree, (2) ordering CPS to deposit and pay the receivership fees, and (3) ordering Dennis to pay temporary attorney fees, as well as erred in (4) its calculation of child support.

[1,2] Although Cantrell assigns error to the district court's decree, she failed to comply with the rules regarding cross-appeals. See Neb. Ct. R. App. P. § 2-109(D)(4) (rev. 2014). Cantrell designated herself as an appellee and noted the cross-appeal on the cover of her brief. However, she did not set forth the cross-appeal in a separate division of the brief as required. See *id*. See, also, *In re Estate of Graham*, 301 Neb. 594, 919 N.W.2d 714 (2018) (cross-appeal section of appellate brief must set forth separate title page, table of contents, statement of case, assigned errors, propositions of law, and statement of facts). Where a party's brief fails to comply with § 2-109(D), an appellate court may proceed as though the party failed to file a brief or, alternatively, may examine the proceedings for plain error. *Estate of Schluntz v. Lower Republican NRD*, 300 Neb. 582, 915 N.W.2d 427 (2018).

## IV. STANDARD OF REVIEW

[3] In an action for the dissolution of marriage, an appellate court reviews de novo on the record the trial court's determinations of custody, child support, property division, alimony, and attorney fees; these determinations, however, are initially entrusted to the trial court's discretion and will normally be affirmed absent an abuse of that discretion. *Donald v. Donald*, 296 Neb. 123, 892 N.W.2d 100 (2017).

A trial court's determination of who should bear the expenses associated with the receivership will not be disturbed on appeal absent an abuse of discretion. See *Sayer v. Bowley*, 243 Neb. 801, 503 N.W.2d 166 (1993), *disapproved on other grounds, Weyh v. Gottsch*, 303 Neb. 280, 929 N.W.2d 40 (2019).

[4] Plain error is error plainly evident from the record and of such a nature that to leave it uncorrected would result in damage to the integrity, reputation, or fairness of the judicial process. *Estate of Schluntz, supra*.

## V. ANALYSIS

### 1. Temporary Alimony

[5] Dennis claims the district court erred in ordering him to pay temporary alimony to Cantrell until the entry of the April 2019 decree. However, as noted by Cantrell, the district court did not order temporary alimony in this case because Cantrell's motion for temporary alimony had been withdrawn in exchange for the parties' agreement that she would continue to receive her salary from CPS. To the extent Dennis takes issue with the continuation of Cantrell's salary beyond a certain point in time, he has not specifically assigned or argued that issue, and we will therefore not consider it. To be considered by an appellate court, an alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error. *Fetherkile v. Fetherkile*, 299 Neb. 76, 907 N.W.2d 275 (2018).

### 2. Receivership Fees

Dennis contends the district court erred in ordering CPS to deposit and pay $7,500 for receivership fees. He argues that Cantrell should have been responsible for the receivership fees because she was the one who requested the receivership and no evidence of the expected receivership costs was presented.

In May 2018, Cantrell filed a motion for appointment of receiver and for accounting, alleging that Dennis was using funds from the parties' companies for his personal expenses and to make a loan to his uncle, all without her authorization; he was fraudulently diverting revenue and earnings from the companies; and he was "systematically cutting" her out of CPS without authority, including changing passwords and emails, and firing her from her duties at CPS.

After a hearing in June 2018, the district court entered an order on August 16 appointing a specified person as receiver of CPS and C & D Leasing:

> His primary duties are to supervise the bookkeeper . . . ; to reconstruct the business expenses for 2017 and 2018 (if not already accomplished through the tax preparation process), to approve of all expenses, and to assure equal access to both parties to all business records of the two [companies]. His authority is not limited to these duties. [CPS] is ordered to deposit the sum of $7,500.00 . . . with the clerk of the district court of Fillmore County to cover [the named receiver's] expenses. Such will be paid on application and order.

In an order filed on October 16, 2018, the district court stated a hearing was held on October 9 that, in part, took up Dennis' motion to reconsider the receivership and the appointed receiver's application to require and set bond. The court noted that affidavits were offered and received into evidence, although neither the affidavits nor a bill of exceptions from the hearing appears in our record on appeal. The court denied Dennis' motion to reconsider. It further found that "bond should be required in the amount of $750,000.00, the premium therefor taxed to [CPS] as part of the cost herein."

In its order dated November 8, 2018, the district court approved the parties' mediated agreement from October 31 and discharged the receiver.

[6] Given the reasons Cantrell sought a receivership, the duties given to the receiver, and the need for bond premiums, we cannot say that the $7,500 receivership fee was untenable or unreasonable. And contrary to Dennis' argument, we cannot say that the district court abused its discretion by not ordering Cantrell to be solely responsible for paying the fee. The effect of the court's order was to make both parties responsible for the fee through their company, in which they were equal owners at the time. We cannot say that the district court's order was an abuse of discretion. See *Sayer v. Bowley*, 243 Neb. 801, 503 N.W.2d 166 (1993), *disapproved on other grounds,*

*Weyh v. Gottsch*, 303 Neb. 280, 929 N.W.2d 40 (2019) (trial court's determination of who should bear expenses associated with receivership will not be disturbed on appeal absent abuse of discretion). Additionally, pursuant to the parties' mediated agreement, Dennis was awarded CPS and was to pay all indebtedness due and owing to any creditor of CPS.

### 3. Temporary Attorney Fees

Dennis claims the district court erred in awarding temporary attorney fees to Cantrell because she failed to present evidence as to the services actually performed or the length of time required for preparation or presentation of the case.

[7] It has been held that in awarding attorney fees in a dissolution action, a court shall consider the nature of the case, the amount involved in the controversy, the services actually performed, the results obtained, the length of time required for preparation and presentation of the case, the novelty and difficulty of the questions raised, and the customary charges of the bar for similar services. *Garza v. Garza*, 288 Neb. 213, 846 N.W.2d 626 (2014).

[8] The filing of an affidavit or presentation of other evidence will always be the preferable way to support the award of attorney fees, but if the contents of the record show the allowed fee not to be unreasonable, then that fee would not be untenable or an abuse of discretion. See *id*. See, also, *Boamah-Wiafe v. Rashleigh*, 9 Neb. App. 503, 614 N.W.2d 778 (2000) (if contents of record, i.e., pleadings, introduced discovery documents, time spent in court as shown by court record, and other items that support award, show allowed fee not unreasonable, then fee not untenable or abuse of discretion).

When the district court awarded Cantrell temporary attorney fees of $5,000 in August 2018, the original complaint for dissolution had been on file more than 1½ years. During that time, numerous documents had been filed, including pleadings, pretrial conference memorandums, and stipulations; agreements between the parties were reached; there had been issues involving the parties' companies that led Cantrell to file a motion

to have a receiver appointed; and the parties had appeared in court. We cannot conclude that the $5,000 temporary award of attorney fees in this case was unreasonable or an abuse of discretion.

### 4. Child Support

Dennis claims the district court erred in its calculation of child support. When determining Dennis' income for child support purposes, the district court included Dennis' W-2 wages from CPS, CPS' ordinary business income with depreciation added back in, and the net rental income of C & D Leasing with depreciation added back in. Dennis' income from the foregoing sources was calculated for each year from 2015, 2016, and 2017, and the 3-year average was used to determine Dennis' total monthly income of $21,120 per month.

Underlying Dennis' claim are his assertions that the district court erred in using the ordinary business income or retained earnings of the parties' companies in its determination of Dennis' income for child support purposes, in sustaining Cantrell's relevance objection as to what the retained earnings or income would be used for in the following years, and in overruling his motion to reopen the evidence.

### (a) Evidence at Trial

The only two witnesses to testify at trial were Dennis and Cantrell. Numerous exhibits, including tax returns, were received into evidence.

According to the evidence, Dennis and Cantrell each owned 50 percent of CPS and received wages and distributions from CPS. CPS elected to file as an S corporation for the tax years relevant to this case, and we therefore treat it as an S corporation in our analysis. Dennis and Cantrell also each owned 50 percent of C & D Leasing. C & D Leasing was a partnership from which the parties received no wages or distributions.

Dennis was the president of CPS, and Cantrell was its vice president, secretary, and treasurer. Dennis did the work in the field for CPS, and Cantrell did the office work. The parties

received wages, tips, and other compensation directly from CPS as follows: in 2015, Dennis received $15,450 and Cantrell received $40,530; in 2016, Dennis received $31,673 and Cantrell received $52,390; and in 2017, Dennis and Cantrell each received $59,600. Dennis agreed that he gave himself a raise and that his salary for 2018 would be "[s]omewhere around" $67,000. Schedule K-1's for Dennis reflect the following amounts for his proportionate share of the S corporation's pass-through ordinary business income and distributions: 2015 income of $39,442, distribution of $19,874; 2016 income of $72,588, distribution of $43,007; and 2017 income of $23,904, distribution of $43,803. Schedule K-1's for Cantrell for those years were nearly identical (within $1). Cantrell agreed that the company's profits left in the business were for upcoming expenses and to buy equipment. She also testified that "[i]t varie[d] year to year why we [took] distributions." She agreed that some of the money went to pay taxes. She also testified that during 1 year some distribution money was used to buy equipment the parties owned personally. Both parties agreed that Cantrell would propose the parties' salaries and distributions each year, and that Dennis then would agree to the proposal. Dennis was awarded CPS in the divorce as part of the parties' mediated agreement.

Cantrell testified that C & D Leasing was set up for accounting and tax purposes; it purchases equipment and leases it to CPS. All of the money in C & D Leasing went to bank loans or additional purchases of equipment. As noted above, the parties did not receive wages or distributions from C & D Leasing. But Dennis' K-1's reflect the following amounts for his proportionate share of the partnership's "other net rental income (loss)": $502 in 2015, $107,302 in 2016, and a loss of $6,790 in 2017. Cantrell's K-1's for those years were nearly identical (within $1). Dennis was awarded C & D Leasing in the divorce as part of the parties' mediated agreement.

Stokebrand Seed is an S corporation owned by Cantrell's family. Cantrell testified that Dennis was paid by Stokebrand

Seed for farming. And his 2017 tax return reports $26,141 in wages from Stokebrand Seed. At trial, Dennis testified he had not received a payment from Stokebrand Seed since the parties' mediation. Dennis said he did not know if he would be farming in 2019 because he had not talked to Cantrell's father about doing so. Cantrell testified that she owns shares of stock in Stokebrand Seed that were gifted to her. She was awarded "all interest" in Stokebrand Seed in the divorce as part of the parties' mediated agreement. Cantrell testified that she never received any actual income or cash from Stokebrand Seed, but she has to claim "any earnings" "on taxes."

Additionally, Dennis and Cantrell's father each owned 50 percent of another business, S&H Bushwackers, a partnership. Dennis was awarded the parties' marital share of S&H Bushwackers in the divorce as part of the parties' mediated agreement.

Cantrell testified that she last attended school in 2001 and 2002 and was one class short of earning an associate's degree in business administration. She had been looking for office work during the pendency of the case and had two interviews, but had not received job offers at the time of trial. Both of the jobs she interviewed for paid $10 to $12 per hour.

Dennis and Cantrell testified that they did not have health insurance. Dennis agreed that he would like to try to find health insurance for the children.

### (b) District Court's Ruling

The district court ordered Dennis to pay Cantrell child support in the amount of $2,553 per month for the two children. When determining Dennis' income for child support purposes, the district court included Dennis' W-2 wages from CPS, CPS' ordinary business income with depreciation added back in, and net rental income of C & D Leasing with depreciation added back in. In 2017, the last year for which tax returns were available in the record, the district court included the following amounts when determining Dennis' income for child support purposes: Dennis' CPS wages of

$59,600, CPS ordinary business income of $23,804, "[a]dd back CPS [d]epreciation" of $50,463.50, C & D Leasing net rental income of $6,790.50, and "[a]dd back C & D Leasing [d]epreciation" of $31,158.50. Thus, the district court determined that Dennis' 2017 income was $171,816.50 for the year, or $14,318.04 per month. However, because there were substantial fluctuations in Dennis' annual earnings, income from the foregoing sources was calculated for each year from 2015 ($204,598.50), 2016 ($383,915), and 2017 ($171,816.50), and the 3-year average was used to determine Dennis' total monthly income of $21,120 per month for purposes of child support. The court noted that Dennis argued that child support should be based on his actual earnings received from CPS and C & D Leasing, "namely his W2 income and distributions from the companies." Although the district court did include Dennis' wages, the court did not include any distributions Dennis received from CPS. We note here that the court likely disregarded actual distributions received by Dennis, since the district court attributed all of the companies' net profits to Dennis for the purpose of calculating child support, thus making the actual distributions irrelevant.

The district court determined Cantrell's earning capacity to be $2,080 per month, based on a 40-hour workweek and a $12 hourly wage; Cantrell's monthly income for child support purposes is not challenged on appeal.

Dennis was ordered to maintain health insurance for the parties' children and was given a $300 credit on the child support calculation worksheet for the health insurance premiums for the children.

### (c) Recent Case Law Addressing Distributions, Net Profits, and Retained Earnings

[9] The Nebraska Child Support Guidelines provide that in calculating the amount of support to be paid, a court must consider the total monthly income. *Gangwish v. Gangwish*, 267 Neb. 901, 678 N.W.2d 503 (2004). See Neb. Ct. R. § 4-204 (rev. 2020). Total monthly income is defined as the

income of both parties derived from all sources, except all means-tested public assistance benefits which includes any earned income tax credit and payments received for children of prior marriages. This would include income that could be acquired by the parties through reasonable efforts. For instance, a court may consider as income the retained earnings in a closely-held corporation of which a party is a shareholder if the earnings appear excessive or inappropriate.

§ 4-204.

[10,11] The Nebraska Supreme Court has not set forth a rigid definition of what constitutes income, but instead has relied upon a flexible, fact-specific inquiry that recognizes the wide variety of circumstances that may be present in child support cases. *Marshall v. Marshall*, 298 Neb. 1, 902 N.W.2d 223 (2017). Thus, income for the purposes of calculating child support is not necessarily synonymous with taxable income. *Id*. We take this flexible approach in determining a person's income for purposes of child support, because child support proceedings are, despite the child support guidelines, equitable in nature. *Marshall, supra*.

This court recently released two opinions wherein the undistributed or retained earnings of and distributions from S corporations were at issue in the context of a parties' income for purposes of child support. See, *Bornhorst v. Bornhorst, ante* p. 182, 941 N.W.2d 769 (2020); *Guthard v. Guthard, ante* p. 156, 942 N.W.2d 792 (2020). Our holdings in both cases more fully developed Nebraska case law in this area. Both opinions discussed the nature of S corporations in general, which we set forth briefly below.

[12-16] Subchapter S is a tax status designed to tax corporate income on a pass-through basis to shareholders of a small business corporation. *Guthard, supra*. Although a subchapter S corporation may distribute income, it is not required to do so. *Id*. Earnings are owned by the corporation, not by the shareholders. *Id*. Subchapter S corporations may accumulate profits, referred to as "retained earnings." *Id.* In a subchapter S

corporation, the income tax is paid by the shareholders rather than by the corporation itself. *Id*. The subchapter S corporation allocates various items of income to shareholders based upon the shareholders' proportionate ownership of stock, and the allocations are itemized on an individual shareholder's K-1. See *id*. Since a subchapter S corporation is not taxed on its earnings, the various income, expense, loss, credit, and other tax items pass through and are taxable to or deductible by shareholders in a manner analogous to that which is applicable to partners. *Id.*

In *Guthard, supra*, we addressed the extent to which undistributed or retained earnings could be deemed available income to a parent-shareholder for child support purposes. Because pass-through earnings are owned by the corporation and are merely allocated to the shareholder for tax purposes, the pass-through income is essentially phantom income (income not actually received by the shareholder) that should not be included as income in child support calculations. However, a court may consider as income the retained earnings in a closely held corporation of which a party is a shareholder if the earnings appear excessive or inappropriate. See, *id*; § 4-204. In other words, if the S corporation is not distributing the entirety of its ordinary business income (net profit), then it is retaining those earnings within the corporation. Such retained earnings may be reasonable and for legitimate business purposes, and a significant amount of retained earnings does not by itself establish an attempt to shield income. See *Guthard, supra*. A determination of the amount of net profit being retained by the corporation can be gleaned from the K-1 by subtracting the amount of income actually distributed to the shareholder from the amount of ordinary business income. In this case, for example, in 2015, Dennis was required to report and pay taxes on his 50-percent share of CPS' ordinary business income of $39,442 (plus or minus certain additional earnings or deductions), yet Dennis received a distribution of only $19,874. What the corporation did not distribute to Dennis was arguably retained by the corporation, and the question becomes whether such

retained earnings were excessive or inappropriate and should be included as income for child support purposes. See § 4-204. We will address this question as applied here in our discussion later in this opinion.

Also, in both *Bornhorst, supra*, and *Guthard, supra*, we addressed the extent to which distributions from S corporations could be deemed available income to a parent-shareholder for child support purposes. We held that distributions made to shareholders to cover corporate tax liability should not be included as income for purposes of calculating child support; however, the amount of a shareholder's distribution which exceeds the correlated tax liability for an S corporation's pass-through income may be subject to inclusion as income for child support purposes. *Id.*

### (i) Wages and Distributions

In determining Dennis' income for the purpose of calculating child support, the district court included Dennis' wage income, but did not include his K-1 distributions.

### a. Wages

It is undisputed that Dennis' wages constitute income for child support purposes. In determining Dennis' total monthly income, the district court's 3-year average included Dennis' CPS wages of $15,450 in 2015, $31,673 in 2016, and $59,600 in 2017 ($35,574 per year average). See, *Gress v. Gress*, 274 Neb. 686, 743 N.W.2d 67 (2007) (3-year average to be used when averaging income); Neb. Ct. R. ch. 4, art. 2, worksheet 1, n.5 (rev. 2016) (income may be averaged in the event of substantial fluctuations of annual earnings). Given the manner in which the district court approached Dennis' income overall, it is understandable why the court used a 3-year average of these wages in its determination of Dennis' total monthly income for child support purposes. However, as we discuss next, the court's use of certain income and depreciation amounts from the parties' businesses was in error. This will require a recalculation of Dennis' income for child support purposes, with

the focus now being placed on wages and distributions paid to Dennis. In that regard, we address an issue Cantrell attempted to raise in a cross-appeal.

Cantrell argues that "it was an error for the trial court not to include all of the salaries, income, and depreciation of the companies assumed by [Dennis] less the cost of hiring a replacement bookkeeper rather than only including [Dennis'] salary and one-half of the business income and depreciation." Brief for appellee at 25. Her argument generally suggests that since Dennis now owns 100 percent of the businesses, a 3-year average should have included all "of the owner salaries, business income, and added depreciation back in," subtracting only the $36,000 "market rate for a bookkeeper each year for the companies." *Id*. at 28. By doing this, Cantrell contends the 3-year average to calculate Dennis' income would be $477,098 per year or $39,758 per month. She also takes issue with the district court's exclusion of Dennis' income from Stokebrand Seed farming, which in 2017 amounted to $26,141 in wages paid to Dennis. As noted earlier, Stokebrand Seed is an S corporation owned by Cantrell's family; Dennis testified that he had not received a payment from Stokebrand Seed since the parties' mediation and that he had not talked to Cantrell's father about whether he would continue farming for Stokebrand Seed. We find no plain error in the district court's exclusion of Dennis' 2017 Stokebrand Seed wages under the circumstances.

When considering the balance of Cantrell's argument on this issue under a plain error review, we note that many of the sources of income Cantrell suggests should be attributed to Dennis would not be properly included as income for child support purposes as we discuss in subsequent portions of our analysis. However, we do find as a matter of plain error the failure to consider Dennis' testimony that he had given himself a raise and that his salary for 2018 would be "[s]omewhere around" $67,000. In accepting Cantrell's present income when calculating child support, consideration should have also been given to Dennis' present income. Dennis' present income of

$67,000 was a more accurate reflection of wages he could reasonably earn going forward; his prior 3-year income average for 2015 through 2017 was only $35,574. When recalculating child support on remand, the district court should attribute a salary of $67,000 per year to Dennis.

### b. Distributions

In determining Dennis' total monthly income for child support purposes, the district court did not include any of the distributions Dennis received from CPS. As mentioned earlier, the court likely disregarded actual distributions received by Dennis, since it attributed all of Dennis' share of the companies' net profits to Dennis for the purpose of calculating child support, thus making the actual distributions irrelevant. Distributions, however, should be addressed separately from retained earnings, since distributions represent what the shareholder actually received from the S corporation (as indicated on a K-1), in addition to any wages received (as indicated on a W-2).

[17] Although distributions represent cash actually received by the shareholder, the distribution is also the shareholder's source of funds to pay the personal tax liability on his or her proportionate share of the S corporation's pass-through income. Distributions made to shareholders to cover corporate tax liability should not be included as income for purposes of calculating child support. See, *Bornhorst v. Bornhorst, ante* p. 182, 941 N.W.2d 769 (2020); *Guthard v. Guthard, ante* p. 156, 942 N.W.2d 792 (2020). In *Bornhorst, supra*, and *Guthard, supra*, we held that distributions made to a shareholder of a subchapter S corporation, as reported on a K-1, should not be included as income for purposes of calculating child support for those portions of the distribution intended to offset the shareholder's personal tax liability on his or her proportionate share of the S corporation's pass-through earnings. However, if the evidence establishes that the total distribution exceeds the shareholder's tax liability on his or her proportionate share of the S corporation's pass-through earnings, such excess

portions of the distribution may be included as income for child support purposes unless the evidence demonstrates that such excess amounts are reasonably expected to be applied to future tax liabilities. *Id*. We noted that an analysis correlating a shareholder's distributions to his or her tax liabilities over a longer period of time may reveal a regular pattern of excess distributions which cannot be solely tied to the tax liabilities associated with the S corporation's pass-through income. *Id*. In such cases, the amount of a shareholder's distribution which exceeds the correlated tax liability for an S corporation's pass-through income may be subject to inclusion as income for child support purposes. *Id*.

The evidence at trial was that Dennis received distributions from CPS in the amount of $19,874 in 2015, $43,007 in 2016, and $43,803 in 2017. And Cantrell testified that "[i]t varie[d] year to year why we [took] distributions." She agreed that some of the money went to pay taxes, although she also testified that during 1 year some distribution money was used to buy equipment the parties owned personally.

Whether and to what extent any distributions Dennis received from CPS exceeded the correlated tax liability for CPS' pass-through income—and were thus subject to inclusion as income for child support purposes—was a matter to be considered by the district court. However, neither the district court nor the parties had the benefit of our opinions in *Bornhorst, supra*, and *Guthard, supra*, during the trial court proceedings below, and the parties did not have the benefit of this court's recent opinions during the briefing stage of this appeal. We therefore reverse the district court's calculation of child support and remand the issue back to the district court with directions. On remand, the district court should consider this court's recent opinions in *Bornhorst, supra*, and *Guthard, supra*, regarding distributions, and it should determine whether and to what extent any distributions Dennis received from CPS should be included as income for purposes of calculating child support.

#### (ii) Net Profits and Retained Earnings

In determining Dennis' income for the purpose of calculating child support, the district court included CPS' ordinary business income and C & D Leasing's net rental income (net profits of both companies), and the court added back in one-half of the depreciation deductions taken by those two companies. We will first address the inclusion of the entirety of the companies' net profits as income attributable to Dennis and will separately address the inclusion of depreciation.

In determining Dennis' total monthly income, the district court's 3-year average included CPS' ordinary business income of $39,442 in 2015, $72,587.50 in 2016, and $23,804 in 2017; these amounts come from Dennis' K-1's and represent his 50-percent share of CPS' total ordinary business income. The 3-year average also included C & D Leasing's net rental income of $502 in 2015, $107,301.50 in 2016, and $6,790.50 in 2017; again, these amounts come from Dennis' K-1's. However, we note that the document relied upon by the district court shows that there was actually a net rental loss of $6,790.50 in 2017.

As evidenced by the tax documents in our record, CPS' ordinary business income, as reflected on Dennis' K-1's, is the corporation's net income before taking into account "Section 179" deductions, distributions, and other adjustments not relevant to our discussion here. As mentioned previously, when the corporation's ordinary business income (net profit) exceeds that which is actually paid out in distributions to its shareholders, then the undistributed profits remain with the corporation and constitute retained earnings. A corporation's retained earnings show its accumulated profits. See *Guthard v. Guthard, ante* p. 156, 942 N.W.2d 792 (2020).

[18,19] As set forth in the Nebraska Child Support Guidelines, "a court may consider as income the retained earnings in a closely-held corporation of which a party is a shareholder if the earnings appear excessive or inappropriate." § 4-204. In *Guthard, supra*, we held that whether retained earnings are excessive or inappropriate necessarily implies that such

earnings are not being retained for legitimate business purposes and could otherwise reasonably be expected to be distributed to a parent-shareholder for inclusion as income for child support purposes. A fact-specific inquiry is necessary to balance considerations that a well-managed corporation may be required to retain a portion of its earnings to maintain corporate operations and survive fluctuations in income, but corporate structures should not be used to shield available income that could and should serve as available sources of child support funds. *Id*. Relevant factors to weigh in determining what portion of undistributed corporate earnings may be available to a shareholder for child support purposes should include the following considerations: (1) the shareholder's level of control over the corporation's distributions—as measured by the shareholder's ownership interest, (2) the legitimate business interests justifying the retained corporate earnings, and (3) the corporation's history of retained earnings and distributions to determine whether there is any affirmative evidence of an attempt to shield income by means of retained earnings. *Id*.

In this case, Dennis and Cantrell each owned 50 percent of CPS. Both parties agreed that Cantrell would propose the parties' salaries and distributions each year and that Dennis then would agree to the proposal. Cantrell agreed that CPS' profits left in the business were for upcoming expenses and to buy equipment. Additionally, Dennis and Cantrell each owned 50 percent of C & D Leasing. Cantrell testified that all of the money in C & D Leasing went to bank loans or additional purchases of equipment. The net rental income from C & D Leasing was reported on the parties' K-1's and individual tax returns in the same manner that the ordinary business income from CPS was reported.

Therefore, based on the testimony of both parties, the profits retained by CPS were for upcoming expenses and to buy equipment and the profits retained by C & D Leasing went to bank loans or additional equipment purchases. There was no evidence adduced by either party that the retained earnings were excessive or inappropriate. In fact, in its final decree, the

district court stated, "[W]e have little evidence regarding the excessiveness or appropriateness of the income." However, the court noted that Dennis was a very poor historian regarding his business management and the court found that many of his statements were not credible. The court also noted that "[i]t was quite clear that Dennis was manipulating income and deductions to his benefit."

We are not surprised by the district court's comment that Dennis was a "very poor historian regarding his business management," since the parties testified that Dennis did the work in the field and Cantrell did the office work for the companies during their marriage. Also, in 2015 and 2016, the parties filed joint tax returns; thus, any "manipulation" of income and deductions in those 2 years benefited both parties. The initial divorce pleading was not filed until December 2016, and Dennis and Cantrell maintained equal ownership of CPS and C & D Leasing until the court approved their mediated agreement in November 2018.

Notably, neither party challenged the legitimacy of the profits retained by CPS or C & D Leasing. Also, the district court specifically found that there was little evidence of the excessiveness or the appropriateness of the companies' income. Without such evidence, and based on the evidence that was presented, the retained earnings of CPS and C & D Leasing appeared to be used to maintain business operations; thus, it cannot be presumptively concluded that retained earnings should be included as income. See *Guthard, supra* (specific inquiry is necessary to balance considerations that well-managed corporation may be required to retain portion of its earnings to maintain corporate operations and survive fluctuations in income, but corporate structures should not be used to shield available income that could and should serve as available sources of child support funds).

We therefore conclude it was an abuse of discretion for the district court to attribute 50 percent of each company's ordinary business income or net profit to Dennis without regard for the actual distributions he received and without evidence that

the retained earnings were excessive or inappropriate. When determining an appropriate income for Dennis for child support purposes, the reasonableness of the businesses' retained earnings was not challenged, and therefore, the court could not simply attribute to Dennis 50 percent of the ordinary business income or net rental income of the companies without evidence of there being excessive or inappropriate retained earnings. Accordingly, we agree with Dennis that only the wages and distributions he received were proper sources of income to consider when determining his income for child support purposes. And as discussed above, there may be limitations on what portion of his distributions should be included as income for child support purposes; any distribution in excess of his tax liability on his proportionate share of pass-through income can be considered as income for child support purposes. See, *Bornhorst v. Bornhorst, ante* p. 182, 941 N.W.2d 769 (2020); *Guthard v. Guthard, ante* p. 156, 942 N.W.2d 792 (2020).

### (d) Depreciation

In determining Dennis' total monthly income, the district court's 3-year average also included "[a]dd back" depreciation from CPS of $89,397.50 in 2015, $61,881 in 2016, and $50,463.50 in 2017. The 3-year average also included "[a]dd back" depreciation from C & D Leasing of $59,807 in 2015, $110,472 in 2016, and $31,158.50 in 2017. The district court found these depreciation amounts in each company's respective federal tax returns; the depreciation amounts added to Dennis' income represent one-half the total depreciation deducted on the business tax returns for those years. Dennis contends that no depreciation amounts should have been added into his income for child support purposes and that alternatively, the district court erred by not sustaining his motion to reopen the case before entry of a final order to allow him to bring in an expert to testify about these depreciation deductions. We begin first by considering the appropriateness of adding back in depreciation deductions taken by the businesses during years in which each party was a 50-percent owner, and thus equally

benefited, and where neither party at trial challenged the depreciation deductions taken on each business' federal tax return for 2015, 2016, and 2017.

Section 4-204 of the Nebraska Child Support Guidelines provides, in relevant part:

> (C) Depreciation calculated on the cost of ordinary and necessary assets may be allowed as a deduction from income of the business or farm to arrive at an annualized total monthly income. After an asset is shown to be ordinary and necessary, depreciation, if allowed by the trial court, shall be calculated by using the "straight-line" method, which allocates cost of an asset equally over its useful duration or life. An asset's life should be determined with reference to the Class-lives and Recovery Periods Table created pursuant to 26 CFR § 1.167(a)-11. A party claiming depreciation shall have the burden of establishing entitlement to its allowance as a deduction.

> (D) . . . Any party claiming an allowance of depreciation as a deduction from income shall furnish to the court and the other party copies of a minimum of 5 years' tax returns at least 14 days before any hearing pertaining to the allowance of the deduction.

Notably, the current depreciation rule set forth above first discusses depreciation as a deduction "from income of the business or farm" to arrive at an annualized monthly income for a parent. § 4-204. As will be discussed below, a prior version of this rule was applicable to a parent who was "self-employed," thus making depreciation deductions a potential issue when looking at a self-employed parent's personal income tax returns. In those situations, a Schedule C (entitled "Profit or Loss From Business (Sole Proprietorship)") or Schedule F (entitled "Profit or Loss From Farming") would reflect depreciation deductions from a business or farming operation in a parent's personal tax return. Further, the depreciation rule places the burden of proving "entitlement to its allowance as a deduction" on the "party claiming depreciation." § 4-204. Since a sole proprietor is able to control purchases made for

his or her business, it is reasonable to place the burden on the sole proprietor parent to prove whether the depreciation deduction for such purchases, as reflected on his or her personal tax return, is appropriate. Interestingly, however, the depreciation rule language is broad enough to place a burden on a parent to prove the appropriateness of a depreciation deduction taken on a business entity's federal tax return regardless of whether the parent has control over such matters, such as a minority shareholder of an S corporation.

Finally, § 4-204 further provides that "[a]ny party claiming an allowance of depreciation as a deduction from income . . . " must furnish a minimum of 5 years' tax returns. In an S corporation situation, the shareholder parent is not claiming an allowance of depreciation as a deduction from his or her personal income in most instances; rather, the depreciation deduction has already been taken by the corporation before determining the ordinary business income or net profit that will be passed through for tax purposes to the parent shareholder. The income attributable to the parent shareholder, as previously discussed, is focused more on what wages and distributions were actually received by the parent from the S corporation, and whether the S corporation's retention of some of its net profits were excessive or inappropriate and could have otherwise been distributed to shareholders. We also note that the depreciation rule does not distinguish between personal income tax returns and other business entity income tax returns, such as those filed by an S corporation or partnership as in the present case.

The depreciation rule is easily applied when dealing with a sole proprietorship business or farming operation in which the taxpayer parent would include in his or her personal federal income tax return a Schedule C or Schedule F, with either form itemizing the business' or farm operation's expenses, deductions, and depreciation. In the past, when factoring in depreciation in cases of self-employment, the depreciation rule required adding back depreciation to the sole proprietor's income for

the purpose of calculating child support. We find it helpful to consider the prior version of the depreciation rule when considering the current rule and its apparent broader application to depreciation that is not claimed on a parent's personal income tax return, but is instead claimed on a separate business entity's federal income tax return.

### (i) Depreciation Rule Prior to September 2002 Amendment

Prior to the amendment of § 4-204 in September 2002, the rule related to depreciation was generally applied to cases involving a self-employed parent, and depreciation was added back to that parent's income when determining child support. See *Gammel v. Gammel*, 259 Neb. 738, 741, 612 N.W.2d 207, 211 (2000) ("paragraph D of the Nebraska Child Support Guidelines . . . provides that where a party is self-employed, depreciation claimed on tax returns should be added back to income"). Notably, in situations of self-employment in a business or farming operation, a party's personal federal income tax return would include a Schedule C for a sole proprietorship or a Schedule F for a farming operation. Therefore, a divorcing party's personal tax return would contain the details regarding what expenses or deductions, including depreciation, were being claimed to reduce the taxable income of that party, and thus also reducing the amount of income to be attributed to that party for child support purposes. See *Rhoades v. Rhoades*, 258 Neb. 721, 605 N.W.2d 454 (2000) (as general rule, income of self-employed person can be determined from his or her income tax return). The depreciation rule required adding back in depreciation to a party's income for child support purposes if that party was self-employed. See *Rauch v. Rauch*, 256 Neb. 257, 263, 590 N.W.2d 170, 175 (1999) (when considering income of self-employed farmer, Supreme Court noted that paragraph D of guidelines "provides that if a party is self-employed, depreciation claimed on income tax returns should be added back to income or loss from the business or farm to arrive at an annualized total monthly income").

Additionally, the depreciation to be added back to the self-employed parent's income included "Section 179" deductions. In *Gammel, supra*, a district court added "Section 179 deductions as well as Schedule C depreciation back to the total income reported" on a father's tax returns. *Gammel*, 259 Neb. at 741, 612 N.W.2d at 211. The father did not challenge the addition of depreciation to his income, but he did take issue with adding to his income "the deductions he had taken under Section 179." *Gammel*, 259 Neb. at 741, 612 N.W.2d at 211. The Nebraska Supreme Court noted that "[t]he Nebraska Child Support Guidelines require that depreciation be added back to income whether such depreciation is taken in the year the parent makes a cash expenditure to purchase property or whether it is taken in a subsequent year when no cash expenditure has been made." 259 Neb. at 743, 612 N.W.2d at 211. Further, "[a] Section 179 deduction is, in effect, accelerated depreciation taken in the year property is placed in service. See, generally, I.R.C. §§ 167 and 168, referring to deductions taken in the first year as 'depreciation.'" *Gammel*, 259 Neb. at 743, 612 N.W.2d at 211.

Another case further developed the law in the area of depreciation prior to the 2002 amendment to the depreciation rule. In *Gase v. Gase*, 266 Neb. 975, 671 N.W.2d 223 (2003), the mother was an attorney and sole shareholder of several subchapter S corporations. In a child support modification action, the father claimed the trial court abused its discretion by failing to add depreciation claimed on the mother's federal income tax returns back to her income for purposes of calculating child support. The mother conceded that any depreciation associated with rental properties owned by her personally should be added back to her income, but that the depreciation reported on her federal income tax returns related to her wholly owned S corporations should not be added back to her income because there was no evidence that she was self-employed. The mother argued that the depreciation "belongs to the corporations and not to her," and as such, the corporate

depreciation could not be added back to her personal income "without first piercing the corporate veil." *Id*. at 983, 671 N.W.2d at 230. The Nebraska Supreme Court found it unnecessary to pierce the corporate veil and concluded that "the owner of a wholly owned S corporation is self-employed within the meaning of the guidelines." *Id*. at 985, 671 N.W.2d at 231. The Supreme Court directed that all depreciation reported on the mother's income tax returns for the 3 years provided and all depreciation from the mother's wholly owned S corporations "must be added back to her income in those respective years. This includes any deductions reported in those years pursuant to § 179." *Gase*, 266 Neb. at 985, 671 N.W.2d at 231. See, also, *Grams v. Grams*, 9 Neb. App. 994, 624 N.W.2d 42 (2001) (depreciation should be included from father's wholly owned S corporation for purposes of calculating child support).

In summary, prior to the depreciation rule being amended in 2002, it was well established that depreciation, including "Section 179" deductions, should be added back into a parent's income if that parent was self-employed, which was construed to include an owner of a wholly owned S corporation.

### (ii) Depreciation Rule After September 2002 Amendment

When § 4-204, the depreciation rule, was amended in September 2002, it no longer contained the reference to a parent being "self-employed." Instead, the rule stated in part that "[d]epreciation calculated on the cost of ordinary and necessary assets may be allowed as a deduction from income of the business or farm to arrive at an annualized monthly income." § 4-204(C). With this amendment, the depreciation rule grew broader in application—it was no longer limited to the "self-employed," and it became more flexible in that it now provided an opportunity for a party to establish that depreciation should be allowed as a deduction when determining a party's income for child support purposes.

The Nebraska Supreme Court's first opportunity to review a case involving the proper treatment of depreciation deductions

under the amended rule was in *Gress v. Gress*, 271 Neb. 122, 710 N.W.2d 318 (2006), a marriage dissolution case involving a father who was a self-employed farmer. We note that at the time of the *Gress* opinion, the language in § 4-204(C) was found in paragraph D of the Nebraska Child Support Guidelines; the Nebraska Child Support Guidelines were later renumbered and codified into its current form in 2008, but the above language from § 4-204 remains the same as it did in *Gress*.

In *Gress*, the father's personal tax returns showed that his taxable income was determined after deducting a depreciation of farm machinery and equipment; the father's tax preparer testified that the deductions were for ordinary and necessary assets in farm operations. The district court determined the father met his burden and established he was entitled to a depreciation deduction under the rule; however, the district court expressed uncertainty about allowing the father the full amount of the depreciation as it might not be in the children's best interests. The district court then used the mother's proposed calculations of the father's income, which averaged his income over a 3-year period after adding one-half the depreciation deductions for each year back to the corresponding year's taxable income. The father claimed the reduced depreciation deduction was in error, and the Nebraska Supreme Court agreed, explaining:

> Depreciation as set out in paragraph D is a matter of proving the ordinary and necessary expenses of doing business. Part of that burden is showing the court that the deduction does not represent artificial treatment of assets for the purpose of avoiding child support obligations. Once the burden is met, the appropriate procedure is for a court to use the straight-line depreciation method in calculating the parent's monthly income. Because a monthly income calculation under paragraph D is mathematical in nature, the effect of a depreciation deduction on child support is not a proper question under paragraph D.

*Gress*, 271 Neb. at 128, 710 N.W.2d at 326. The Supreme Court concluded that after the district court found the father met his burden and established that he was entitled to a depreciation deduction, the district court was then required to calculate the father's income "using the straight-line method of depreciation without any manipulation of the figures." *Id*. at 129, 710 N.W.2d at 326. The Supreme Court pointed out:

Although what effect depreciation has on child support is not a proper question under paragraph D, once a potential child support obligation has been determined based upon the calculations under paragraph D, paragraph C permits a deviation from the guidelines "whenever the application of the guidelines in an individual case would be unjust or inappropriate."

*Gress*, 271 Neb. at 129, 710 N.W.2d at 326. The issue of child support was reversed and remanded back to the district court for further proceedings.

The Nebraska Supreme Court recently addressed depreciation deductions in a child support modification action involving an S corporation in *Hotz v. Hotz*, 301 Neb. 102, 917 N.W.2d 467 (2018). In that case, the father argued the district court erred in not deducting depreciation from his total monthly income because he submitted his 2016 personal and corporate tax returns into evidence and both included claimed depreciations. On appeal, the Nebraska Supreme Court stated, "While the [Nebraska Child Support Guidelines] do[] permit for an allowance of depreciation as a deduction from total monthly income, it also provides specific instructions for proving an entitlement to the deduction and how the deduction should be calculated." *Hotz*, 301 Neb. at 112, 917 N.W.2d at 476. It noted § 4-204 requires that a minimum of 5 years' tax returns be furnished, a depreciated asset must be shown to be ordinary and necessary, and depreciation must be calculated by using the straight-line method. The Supreme Court found the district court did not abuse its discretion by not deducting the father's claimed depreciations from his monthly income.

See, also, *Fichtl v. Fichtl, ante* p. 380, 944 N.W.2d 516 (2020)
(in child support modification, district court erred in awarding
husband depreciation deductions in calculation of husband's
monthly income when he did not meet burden of showing
he was entitled to depreciation deduction; husband, who was
50-percent owner of construction business, did not provide 5
years' tax returns, did not prove business assets were ordinary
and necessary, and did not prove depreciation was calculated
by using straight-line method).

In this case, the district court found that Dennis failed to
adduce any evidence regarding asset depreciation at trial, and
then, he asked for leave to reopen the case to put on such
evidence, which the court denied. The court suggested that
"Dennis was manipulating income and deductions to his ben-
efit." Therefore, when calculating Dennis' income for child
support purposes, the court included the depreciation figures
contained on the business income tax returns for CPS and
C & D Leasing for 2015, 2016, and 2017.

However, unlike the self-employment situations and the
more recent child support modification cases just summarized,
the case before us is an initial divorce action involving pass-
through income business entities, and during the tax years at
issue—2015 through 2017—the parties were each 50 percent
owners of those businesses. The parties were therefore equally
responsible for the businesses' purchases and the proper report-
ing of depreciation deductions, and they both equally received
the benefit of such deductions during those tax years. Cantrell
did not challenge their claimed depreciation deductions for
those tax years for either business, which is not surprising,
since she was substantially involved in the financial dealings of
the businesses, including determining how much they would be
paid in salaries and distributions. Thus, as we pointed out ear-
lier, at least for 2015 and 2016 when the parties filed joint tax
returns, any "manipulation" of income and deductions in those
2 years was agreed to by both parties and benefited both par-
ties. Further, although the parties did not file a joint personal

tax return in 2017, there is nothing to suggest the 2017 depreciation amounts contained on the businesses' tax returns for that year should be treated any differently, since the businesses remained jointly owned until the district court approved the parties' mediated agreement in November 2018.

[20,21] The key to determining whether depreciation deductions should be included as income for child support purposes is to show to the court that "the deduction does not represent artificial treatment of assets for the purpose of avoiding child support obligations." *Gress v. Gress*, 271 Neb. 122, 128, 710 N.W.2d 318, 326 (2006). When a husband and wife hold an equal interest and are both active in business entities during the course of their marriage, the risk of artificial treatment of assets for the purpose of avoiding child support obligations does not exist. In this case, the 2015, 2016, and 2017 business income tax returns were submitted when the parties were equal owners of CPS and C & D Leasing. Thus, unless one equal owner of a business affirmatively claims inappropriate, fraudulent, or "artificial" deductions contained on a business' income tax return, the other equal owner should not be required to affirmatively prove the validity of depreciation claimed on a corporation's or partnership's federal income tax return. This is especially true here, where both parties had equal authority and equal opportunity to ensure the accuracy of their business income tax returns for the tax years at issue, and neither party challenged the legitimacy of the depreciation deductions at trial.

We therefore conclude that the district court abused its discretion by including the depreciation deductions taken by CPS and C & D Leasing when determining Dennis' income for the purpose of calculating child support. We note, however, that consideration of depreciation deductions, as well as the appropriateness of retained earnings for CPS and C & D Leasing, will certainly be relevant in any future child support modification action involving these parties, since in the future, all such

depreciation and retained earnings will be subject to Dennis' sole ownership and control.

### (e) Reverse and Remand

We therefore reverse the district court's calculation of child support and remand the issue back to the district court with directions to recalculate Dennis' child support obligation to include his annual wage of $67,000 from CPS and any portion of his distributions in excess of the amounts needed to cover his personal tax liability on the businesses' pass-through income as discussed above and in *Bornhorst v. Bornhorst, ante* p. 182, 941 N.W.2d 769 (2020), and *Guthard v. Guthard, ante* p. 156, 942 N.W.2d 792 (2020).

### 5. Remaining Issues

Dennis argues that the district court erred in sustaining relevance objections related to retained earnings and in overruling his motion to reopen the evidence as to depreciation expenses for the parties' companies. Because our analysis of retained earnings and depreciation resulted in a favorable outcome for Dennis with regard to these matters, it is not necessary to address these assigned errors. An appellate court is not obligated to engage in an analysis that is not necessary to adjudicate the case and controversy before it. *Seldin v. Estate of Silverman*, 305 Neb. 185, 939 N.W.2d 768 (2020).

### 6. Credit for Health Insurance

Cantrell also attempts to cross-appeal the district court's decision to give Dennis a $300 credit for health insurance premiums for the children despite a lack of evidence supporting such a credit, but as previously noted, she failed to comply with the rules regarding cross-appeals. Although Cantrell claims a lack of evidence, we note that the district court received into evidence each party's proposed child support calculation, and Dennis' calculation included a $300 credit for the health insurance premium for the children. Having reviewed the record for plain error, we find none.

## VI. CONCLUSION

For the reasons stated above, we reverse the district court's calculation of child support and remand the issue back to the district court with directions to recalculate Dennis' child support obligation using his wage income as set forth above and any appropriate portion of his distribution income as discussed above. We affirm the remainder of the decree.

Affirmed in part, and in part reversed
and remanded with directions.